**FILED**

FEB 2 1 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name  Henderson,      Demora          A.
           (Last)           (First)         (Initial)

3  Prisoner Number  G-21923

4  Institutional Address  CSP-Solano, 2100 Peabody Rd., Vacaville, CA 95696-4000.  **(PR)**

5

6  ================================================================

7  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA                    **CW**

8  DEMORA HENDERSON,                    **CV12      0810**
         petitioner,                  )
9                                      )
                                       )
           vs.                         )      Case No. _____
10                                     )
                                       )
11  _____   )      **PETITION FOR A WRIT**
                                       )      **OF HABEAS CORPUS**
12  _____   )
                                       )
13  _____   )
                                       )
   G. SWARTHOUT, WARDEN,               )
14       respondent.                   )
                                       )
15 ================================================================

16            Read Comments Carefully Before Filling In

17  When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located.  If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

<u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

1. What sentence are you challenging in this petition?

    (a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

    <u>San Francisco Superior Court, 850 Bryant St., San Francisco, CA 94103.</u>

    Court                      Location

    (b)   Case number, if known <u>#200649</u>

    (c)   Date and terms of sentence <u>June 2, 2008; 50 years to life.</u>

    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>x</u>    No _____

    Where?

    Name of Institution: <u>CSP-Solano</u>

    Address: <u>2100 Peabody Rd., Vacaville, CA 95696</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>Pen. Code §§187(a),12022.53(d).</u>

_____

_____

_____

3. Did you have any of the following?

    Arraignment:              Yes __x__     No _____

    Preliminary Hearing:       Yes __x__     No _____

    Motion to Suppress:        Yes _____     No __x__

4. How did you plead?

    Guilty _____   Not Guilty __x__   Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __x__    Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?        Yes _____     No __x__

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment           Yes __x__     No _____

    (b)    Preliminary hearing     Yes __x__     No _____

    (c)    Time of plea           Yes __x__     No _____

    (d)    Trial                Yes __x__     No _____

    (e)    Sentencing           Yes __x__     No _____

    (f)    Appeal              Yes __x__     No _____

    (g)    Other post-conviction proceeding    Yes _____     No __x__

8. Did you appeal your conviction?        Yes _____     No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal          Yes __x__     No _____

        Year: __2010__     Result: __Judgment Affirmed_____

        Supreme Court of California    Yes __x__     No _____

        Year: __2011__     Result: __Denied, (See Exhibit A, infra.)__

        Any other court          Yes __x__     No _____

        Year: __2010__     Result: __Denied_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                    Yes __x__      No_____

(c)    Was there an opinion?                 Yes __x__      No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

Yes_____      No _x_ N/A

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?          Yes __x__      No_____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition. You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following

questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: San Francisco Superior Court

Type of Proceeding: Habeas Petition

Grounds raised (Be brief but specific):

a. Trial court had sua sponte duty to conduct competency determinations

b. Ineffective assistance of counsel re: competency issue

c._____

d._____

Result: Denied                           Date of Result: 7/23/10

II.   Name of Court: California Court of Appeal-First Appellate District

Type of Proceeding: Habeas Petition

Grounds raised (Be brief but specific):

a. Same as #9(a)(I)(a), ante.

b.

c.

d.

Result: Denied                                    Date of Result: 4/29/10

III.   Name of Court: California Supreme Court

Type of Proceeding: Habeas Petition

Grounds raised (Be brief but specific):

a. Same as #9(a)(I)(a), ante.

b.

c.

d.

Result: Denied (See Exhibit A, infra.) Date of Result: 9/1/10

IV.    Name of Court:

Type of Proceeding:

Grounds raised (Be brief but specific):

a.

b.

c.

d.

Result:                                            Date of Result:

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____        No X ____

Name and location of court:

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to
support each claim.  For example, what legal right or privilege were you denied?  What happened?
Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

Ground One:    PETITIONER CONTENDS THE UNDULY SUGGESTIVENESS OF THE
               IDENTIFICATION PROCEDURE, VIOLATED HIS FOURTEENTH
               AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION,
               RESULTANT IN PREJUDICE.

A due process violation occurs when a pretrial identification
procedure is so impermissibly suggestive that it gives rise to a
very substantial likelihood of irreparable misidentification. [Citation.]

In the instant case the initial photo-array was so biased, that
even eyewitness Christina Medina (Medina) commented on the different
physical characteristics between the **fillers** and petitioner's photo-
graph. (CT 134-137.)  Medina observed all five of the other photographs
were of lighter-skinned men than number 2, at least three of whom had
round rather than elogated faces, and that even number 2 was not as
dark as the man she remembered.  Ultimately. Medina **could not identify
anyone,** although, petitioner's picture was in position number 2, which
looked similar based solely on skin color and shape of his head. (See
RT 507,957-959,1955-1956,1959.)

Petitioner, subsequently moved to exclude the unduly suggestive
identification procedure based on his Fourteenth Amendment right
to due process.  A copy of this photo lineup can be located in the
appellate record albeit, none of the faces are distinguishable in
that black & white photocopy. (CT 390.)  Therefore, petitioner re-
quests that judicial notice be taken within the ambit of Fed. R.
Evid., Rule 201, of People's Exhibit 11, which is the lineup exactly
as it was shown to Medina (RT 519), or People's Exhibit 44, which
is that same lineup, re-marked as a trial Exhibit and identified
at trial by Medina. (RT 962-963.)

The facts reflect that shortly before 2:00 a.m., Medina stopped

her car to let in a man who wanted to buy a gun from Medina's
boyfriend, [decedent] Rufino Gutierrez, (Gutierrez). Medina
testified the street lighting was bright enough for her to see
the man, who got into the back seat from the passenger's side.
(RT 934.) Medina proffered she had **never seen him before**, further,
elucidating she only saw him for a **few seconds.** (RT 118,995.)
She did not turn around or look back at him after he got in the
car and did not look at him when he left it. (RT 995-996,1056-57.)
Her attention was entirely on Gutierrez, after he got in. (CT 264.)

Thus, those few seconds [in the dark of night] as this man appro-
ached the car was Medina's only opportunity to see this stranger,
wearing a hooded sweatshirt.

According to Medina, after Gutierrez handed this stranger the
gun, she heard three shots. (RT 937,945.) Then the man got out
of the vehicle and fled. (RT 947-948.)

Four hours after Medina drove the wounded Gutierrez to the hos-
pital, she was interviewed by police. (RT 114-115,117.) Her
recorded interview established that, before any questioning began,
her brother [who was there with her, Mitchell Salazar], said to
her, "Everyone thinks its them Army Street niggers. That's what
everybody keeps saying." (CT 233.)

Therefore, if Medina had any question in her mind as to the
race or age or possibly even the general look of this stranger,
she was conditioned to believe he was a young African-American.
(RT 2414-2415.)

Medina then described the shooter she saw as an African-Ameri-

6a

can male under 25 years of age. (CT 248.) She saw him from over her right shoulder as he got into the car. CT 293.) She said, "**I looked real quick. I didn't really look at him.**" (CT 257.) She did not look in the rear-view mirror at him; nor had she seen him before. (CT 282,285,293.)

He was dressed in black, with a hoodie he wore the entire-time, so that she couldn't see his hair; he had no identifying jewelry or facial hair. He had a skinny long face with acne scars on his cheeks and forehead. (CT 256-257,293.) Although, Medina could not estimate how tall he was, he was skinny, lanky and very dark-complected. (RT 258.)

Medina was specifically asked if the shooter had **any bling-bling on his teeth or [sic] anything,**" and replied, **"No."** (CT 256.) In fact, petitioner had permanent gold crowns on his two front teeth. (RT 1451-1454,1769-1771.)

That same afternoon a police investigator received an anonymous tip that petitioner was involved in the murder. (RT 2074-2076.) He then created the first lineup shown to Medina. (RT 520.) Petitioner's picture was in position number 2, in the middle of the top row. Medina could not identify anyone, although she said number 2 looked similar, based on skin color and the shape of his head. (RT 507,957-959,1955-1956,1959.)

This lineup also was recorded, the investigator repeatedly drew Medina's attention back to petitioner's photograph, even though, as Medina herself noted, all five of the other photographs were of lighter-skinned men than number 2, at least three of whom had round rather than elongated faces, and that even number 2

6b

was not as dark as the man she remembered.( CT 134-137.)  At trial
Medina recalled that in this photo lineup the person in the num-
ber 2 position had the darkest skin; he also had a thin face
whereas the other pictures were of men with rounder faces.(RT 999.)

Thereafter, that investigator received information about a
different possible suspect; another photo spread was constructed
with that person in it, but not petitioner. (RT 1959.)  Medina
was shown this second photo lineup; from comments she made, it
is clear that none of the fillers matched any of the physical
characteristics she had told police about, and the entire top
row of photos were of people who were "much older." (CT 326-329.)
In short, they did not look anything like the person who killed
Gutierrez. (RT 963-967,1960-1961.)

Medina then met with a police sketch artist and helped him
develop a picture of this unknown suspect. (RT 967-968.)

Finally, a live lineup was conducted, in which the suspects
said phrases Medina heard the shooter say. (CT 59-63.) Petitioner
was one of the individuals in that lineup, in position number 3.
(RT 110.)  At trial Medina admitted that at the time she viewed
this live lineup, she already had heard through "word of mouth"
on the street that someone who had been arrested on another case,
and was in jail, was the person who killed Gutierrez. (RT 1057-58.)
She said, she recognized the person in position number 3.(RT 978.)
However, she hedged that identification by stating the others
looked less like the suspect she remembered: "he looks a lot
like the person that [unintelligible] although the voice is a
little off but it wasn't the other ones."(CT 387.)

During the defense's case-in-chief, a memory expert explained how humans tend to fill in gaps in their memory (RT 2411-2412); that the more something is repeated, the more it becomes accessible to the person remembering it (RT 2413-2414); and that due to "unconscious transference" a witness can confuse a picture from a mug book with the actual perpetrator, because the faces seem familiar. (RT 2420-2424.) Such exposure cannot be undone. (RT 2424.) Once someone has decided "this is the person," they are unlikely, overtime, to change that decision. (RT 2430-2431.)

We can readily glean the identification procedure[s] in this case was unduly suggestive for multifarious reasons: (1) Inspector Steven Balma (Balma) conducted the initial photo-array with photos of light-skinned and round faced suspects and by subtly reinforcing in Medina's mind that number 2 in the lineup [petitioner], had the skin color and facial shape of the unknown suspect; (2) Medina, after being shown the second photo-array, which was also recorded (CT 325-360), established that she thought: "some of them are too light" (CT 326); the only one who was darker-complected than the others had a round face (CT 327); number one was too old; number two, three and five had round faces (CT 327-328); number four was too light (CT 328); number six had a round face (CT 328-329); none of these photos depicted men with acne scars (CT 329); and, the top row (numbers one, two and three), all were older than 25 years of age; (As a result, not only did Medina not identify anyone, but she dismissed all six photographs as not looking anything like the person who killed Gutierrez.) (RT 963-67,1960-61); (3) the voice lineup procedure, i.e., compelling petitioner to

6d

utter a criminal's words clearly has the potential to violate
due process by comprising the presumption of innocence; (4) Medina
conceded when she viewed the live lineup she already heard, that
the person who killed Gutierrez had been arrested, on another
case, (RT 1057-58); (5) at trial, Medina identified petitioner
only after the prosecutor stood directly behind him and drew

her attention to him, (RT 934-35); "Despite the fact that Medina
said the shooter had no facial hair in her initial police inter-
view, four of the five fillers in the videotaped lineup have
facial hair: #1 has a moustache; #2 and #4 have goatees; #5 has
a moustache and goatee.  That leaves only petitioner and #6 who
has a very deep distinctive voice; notwithstanding, the fillers
have attributes which automatically exclude them e.g., #1 is
missing patches of hair from his eyebrows; #'s 4 and 5 have
round faces; #5 has a distinctive mouth. Moreover, petitioner
has the darkest skin of all of them. (CT 11); and (6) the re-
petitive showing of the same person, a priori, led Medina to
the shooter, not by an independent source, but rather seemingly
by exclusion as evinced through Medina's own testimony.

The Court of Appeal [Slip Opin. pp. 3-8], gives an imprimatur
to the trial court's finding that the identification procedure
was not unduly suggestive, obviating the necessity to determine
its reliability. (Id. at p.7.) Petitioner, asserts the last
rendered state court opinion is an "unreasonable" conclusion in
light of the facts presented to the State courts,' requiring

reversal. (§2254(d)(1), (2).)

**Ground Two:**     THE TRIAL COURT ERRED, DENYING PETITIONER'S MOTION TO
EXCLUDE INCULPATORY CELL PHONE EVIDENCE, DESPITE THE
GOVERNMENTAL FAILURE TO PRESERVE ALL CELL PHONE EVIDENCE
AFTER RECOGNIZING ITS IMPORTANCE TO THIS CASE, IN CON-
TRAVENTION OF DUE PROCESS UNDER THE UNITED STATES CONSTITUTION.

We can well acquiesce the government's case-in-chief against pe-
titioner was a weak case, with no forensic or physical evidence.
The only evidence of identity came from Medina's belated identification
of petitioner.  In which we can readily glean from the historical
record as memoerialized by [the sole percipient witness] Medina,
[herself] the identification procedures were intrinsically suggestive.
Thus, the prosecution needed to corroborate the identification.

The relevant facts are: Gutierrez  was a Norteno gang member
who had suffered a prior gunshot wound. (CT 185,434-444;RT 579-81.)
Medina told police that Gutierrez had been feuding with African-
American males, from both the Alemany projects and from Army Street,
and also with Hispanic males from 24th Street. (CT 238-241,285-286,
288.)  He had "major problems" with Hispanic males from Back Street
who "try to act black..." (CT 286.)

Gutierrez recently had been riding in a van with a non-gang mem-
ber named "Mario" [i.e., Mario Monge]; someone shot at the van,
killing Mario.  At Mario's funeral Medina overheard people say the
intended target was Gutierrez. (CT 241-242.)  Gutierrez's father
told police about a different incident that occurred three months
earlier: a few days after Gutierrez drove his sister Marta's car,
someone threw a Molotov cocktail at that car while it was parked.(CT 361.)

In Medina's mind it therefore was unusual for an African-American
male to call Gutierrez, or for Gutierrez to be willing to sell a
gun to one, because Gutierrez has been having problems with them. (CT 265.)

6f

Thus, within a few hours after Gutierrez's death, police knew Gutierrez had enemies, was fighting with both African-American and Hispanic gang members, and already had been the likely target of a failed assassination.

Early in the investigation the police investigator received a tip from a citizen that a female African-American groomer at a Petco had a teenaged brother who was bragging that he had killed "a Mexican in the Mission," and appeared to be referring to Gutierrez. (CT 306-308, 310-312,314.) And the Gang Task Force developed yet another suspect other than petitioner. (RT 1959.)

As a result, less than two weeks after Gutierrez was shot, officers were aware that someone allegedly confessed to killing Gutierrez; that there was yet another suspect other than petitioner; and violent acts recently had involved Gutierrez.

Moreover, police developed evidence that Gutierrez sold drugs, which would explain his extensive cell phone use. (CT 107,112,123, 239.) Medina and Gutierrez had two cell phones, both of which they used: Eternal Bliss and Hubby. (RT 904-906,989-990.)

Petitioner did not have a cell phone of his own. (CT 123-124.)

Medina recalled that several calls were made to Eternal Bliss that day by a man whose voice she described as African-American. These calls originated from different telephone numbers and even different area codes. Gutierrez told Medina this man wanted to buy a gun. (RT 907-914.) Police therefore obtained Metro PC records for Eternal Bliss five days after the shooting. (RT 162.)

Those records reflect that on February 3-4, 2006 hundreds of calls were made to and from Eternal Bliss. (RT 207;CT 228-232.)

6g

Significantly, at 4:59 p.m. and other times that day, calls were made from petitioner's friend Lafayette Thomas's phone to Eternal Bliss. (RT 1366,1485.) Petitioner used his friend Dimitri Braud's telephone before 8:00 p.m. (RT 1615-1616.) Records for Eternal Bliss reflect that several calls from that phone were made on that day to Eternal Bliss. (RT 1367-1374.) And beginning at 9:03 p.m., ten calls to or from Michael Bonner's cell phone ("Easy Smith") connected with Eternal Bliss, including the last call made to Eternal Bliss before the shooting. (RT 1392-1396,1403,2140.) As a result, during his investigation the key detective on this case handwrote a request for reports about Bonner, referring to him as

"a possible witness/suspect" in Gutierrez's killing. (CT 324.)

But Hubby also was used that day, at least 19 times, because it was used to call Eternal Bliss. (CT 227-232.) Thus, police should have recognized that phone records of all of Gutierrez's cell phones were likely relevant to their investigations, as were the records for Bonner's phone.

The police recognized that Bonner was a possible suspect or witness in this case, and went so far as to obtain a warrant for Bonner's cell phone records, they evidence a clear understanding that those records possessed an apparent evidentiary value, within the meaning of Trombetta, supra, 467 U.S. at 488.

But police so delayed seeking other cell phone records (in excess of one-year, in the case of Gutierrez's "Hubby" phone), that the relevant records already had been purged by the phone company by the time subpoenas issued. (CT 320-321,399;RT 205-206.)

6h

Surely, we can glean the **bad faith**, upon law enforcement personnel, to restrict the flow of information to petitioner.

To establish a violation of a Constitutional right to present evidence, a defendant must make a "plausible showing of how [the] testimony would have been material and favorable to his defense." See Valenzuela-Bernal, supra, 458 U.S. at 867.

Petitioner's court-appointed attorney, lodged a declaration with the court, explaining petitioner was not charged in the instant case until late August, 2006 so by the time his attorney issued a September, 2006 defense subpoena for Bonner's phone records, they already were unavailable due to the passage of time. This would be true for suspect #2's phone-records, and the call detail records for Hubby, as well.

Yet, abstruse as it may be the trial court denied petitioner's Trombetta, motion in which sought the exclusion of Gutierrez's cell phone records as a sanction. (CT 1-8;RT 348-371.)

Petitioner contends the erroneous evidentiary ruling was an abuse of discretion, predicated on the records at issue had an apparent exculpatory value; moreover, the police were aware its intrinsic value to petitioner. The government here was not merely negligent in failing to preserve the phone records, they did so in such a belated fashion, despite having search warrants to ensure **all** the various phone records correlative with the case were marshalled. This evinces **bad faith** on part of the government. Youngblood, 488 U.S. 58.

Here, the inculpatory evidence from Eternal Bliss was admitted to evidence; while petitioner was prevented from utilizing phone

6i

records from Gutierrez's other phone (Hubby); or all phone records
of Michael Bonner, suspect #2, whom purportedly confessed to killing
some Mexican in the Mission, i.e., Gutierrez. (CT 306-08,310-12,314.)

Medina told police their other phone Hubby "was dead," so the
day of the offense Gutierrez had been using Medina's phone. (CT 266.)
Albeit, Metro PC records reflect Hubby was used to call Eternal
Bliss 19 times on the day of the shooting. (CT 227-232.) Medina
also told police that several calls were made to Eternal Bliss
that day by a man whose voice she described as African-American.
Gutierrez told Medina this man wanted to buy a gun. (RT 907-914.)

Medina claimed they had never had set up the voicemail feature
for Eternal Bliss, so this man could not have left a voice message
from suspect #2's phone ( Shawn ) to Eternal Bliss.(RT 1371-74,1392-95.)

Medina, also claimed that after Gutierrez was shot she drove
straight to the hospital, calling only Marta (not 911), en route.
(CT 297;RT 346-347,949-951.) At trial Marta confirmed Gutierrez
called her around 1:20 a.m., to say he's been shot. Yet, the
same Eternal Bliss records which Lt. Balma procured from Metro PC
reflect no calls were made to or from Eternal Bliss for a 70 min-
ute period between 12:53 a.m. through 2:03 a.m., when Medina was
already at the hospital. (See RT 1395-96,1403,2140.) Clearly,
Medina used some other phone to call Marta while driving to the hospital.

Therefore, it was quite apparent, Lt. Balma should have recog-
nized: (1) Medina was untruthful when she said, Hubby was dead;
(2) furthermore, when she said they only used Eternal Bliss on February
3rd, she was lying; (3) numerous calls were made from Hubby that
day (based solely on the numerous calls to Eternal Bliss); in all
likelihood, Hubby was the phone used to call Marta; and (4) Medina

6j

was additionally untruthful when she claimed they had not established
voicemail for Eternal Bliss, as one of the calls from Michael
Bonner's phone went to voicemail and may have been used to leave
a voicemail message on Eternal Bliss.

Surely, the police would have recognized the importance of all
the phone records of Gutierrez's phone's were germane to their
investigations, as were the phone records of Bonner who called
the victim just prior to the shooting.

Notwithstanding, the copious **impeachment** evidence of the govern-
ment's sole eyewitness, Medina, and the role this evidence would
have at trial, that is, to impeach the veracity of her testimony
and ostensible identification of petitioner thereto.

The Court of Appeal [Slip Opin. pp. 8-13], further opined, that
Medina testified that both phones were working the day Gutierrez
was killed. (Id. p. 11.)  Therefore, viz., petitioner's argument
that the second cell phone could have been used to impeach Medina's
statement to the police that it was not functional is inapposite.

Petitioner contends the state courts' conclusion was an "unreasonable"
decision in light of the facts presented, in contravention of §2254
(d)(2); and/or an "unreasonable" or "contrary" application of
federal law as determined by the Supreme Court (§2254(d)(1)),
as the Government's conduct here elucidates **bad faith** having a
"substantial and injurious effect or influence in determining the
jury's verdict," resultant in prejudice, requiring reversal.
//

**Ground Three:**     PETITIONER'S FAIR TRIAL AND DUE PROCESS RIGHTS
UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION, WERE SEVERELY ABRIDGED,
DUE TO THE TRIAL COURT'S ERRONEOUS EVIDENTIARY
RULING, PREVENTING PETITIONER THE OPPORTUNITY TO
PRESENT THIRD-PARTY CULPABILITY EVIDENCE AS A DEFENSE.

In the instant case the historical record elucidates Gutierrez
was a Norteno gang member who sold drugs and had suffered a prior
gunshot wound (CT 185,249,434-444); had been feuding with African-
American males, from both Alemany pojects and from Army Street,
and also with Hispanic males from 24th Street  (CT 238-241,285-286,
288); he also had "major problems" with Hispanic males from Back
Street who try to act black..." (CT 286.)

Clearly, we can discern Monge's murder was germane to this case,
as Medina's statement to the police established that whoever shot
Monge had been aiming at Gutierrez, and that Suspect #2, was the
likely suspect in the earlier murder, ipso facto a serious suspect
in this case.

The trial court agreed with petitioner, that discovery of the
requested material "certainly...impacts the potential for [a]
defense to these charges under a third-party culpability theory..."
(RT 560.)  Then, denied petitioner's motion, opining, viz., the
Governmental interest in protecting an ongoing criminal investi-
gation outweighs petitioner's right to present a defense. (See RT
560-561.)  Further, asserting how the Monge crime is unsolved, and
nobody was [yet] charged, doubting petitioner's investigators
could solve the case, where the police had been unable to. (RT 561,563.)

Petitioner contends the trial court's determination refusing
third-party culpability evidence, doubting that petitioner's in-

vestigators could solve the Monge murder, is an "unreasonable"
view of the law and assessment of the facts correlative with third
party culpability evidence that permeated this trial. (§2254(d)(1),
(2).) Moreover, the Monge murder investigation had been relatively
idle for in excess of two years, further exacerbating the denial
of petitioner's **attempted defense.**

In this case, the dispositive question is whether the third-party
evidence available and subsequently sought by petitioner was **material.**
That is, did the third-party culpability evidence raise a reasonable
probability sufficient to undermine confidence in the outcome?

In assessing the interests at issue in this case, we invoke the
five-part balancing test formulated in Miller v. Stagner, 757 F 2d
988,994 (9th Cir. 1985): (1) the probative value of the excluded
evidence was a central issue, simply because there was no forensic
or physical evidence in this case. Therefore, the fact numerous
gangs [both African-American and Hispanic's] were after Gutierrez,
they had already attempted to kill him, yet mistakenly killing Mario
Monge. Notwithstanding, suspect #2, who allegedly confessed to
killing a Mexican in the Mission. Illuminating myriad viable sus-
pects, and is without a doubt probative to whether petitioner
killed Gutierrez; (2) its reliability, must be presumed as law
enforcement personnel compiled this information; (3) the evidence
was capable of evaluation by the trier of fact because petitioner
could have introduced government reports, records and expert testi-
mony correlative with governmental evidence marshalled; (4) the last
two Miller factors weigh most strongly in favor of finding that
petitioner's evidence was important to his **attempted defense.**

Because the trial court ruled, the State's interest of confidentiality regarding an ongoing investigation outweighed petitioner's right to present a defense (RT 560-561) it excluded, "the sole evidence on [an] issue" that "constitut[ed] a major part of the attempted defense."

The Court of Appeal [Slip Opin. pp. 12-13], addresses the unitary discovery request correlative with police reports pertaining to the killing of Mario Monge. Albeit, the substantive claim raised on direct-appeal differs markedly, i.e., petitioner asserted the refusal of third-party culpability evidence violated his right to present a defense. For example, not only discovery surrounding the facts of the Monge killing; but suspect #2, had allegedly confessed to killing either Gutierrez or a Mexican in the Mission (noting, Gutierrez was killed in the Mission and is Hispanic.)

Therefore, we can readily glean the State court of appeal failed to consider the third-party culpability claim in its entirety.

Petitioner asserts the erroneous evidentiary ruling [in these circumstances] a priori, denied petitioner's **attempted defense** having a substantial injurious effect or influence on the verdict, and therefore is not harmless. (See <u>Brecht v. Abrahamson</u>, 507 U.S. 619,637-638 (1993).) The California Court of Appeal's conclusion to the contrary constitutes an objectively unreasonable application of **Chambers**, requiring reversal.(§2254(d)(1),(2).)

//

**Ground Four:**    THE CUMULATIVE EFFECT OF THE THREE FOREGOING ERRORS DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO FUNDAMENTAL FAIRNESS AND DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The combined effect of these erroneous evidentiary rulings abrogated fundamental fairness, permitting the People to introduce testimony that Medina identified petitioner as the shooter. (argument 1,supra); inculpatory evidence corroborating that tesimony, while the defense was unfairly prevented from marshalling and subsequently proffering exculpatory evidence in equipoise, as well as impeachment evidence (argument 2, supra); and precluded from presenting the third-party culpability prong of his affirmative defense of alibi (argument 3, supra).

We can readily glean the identification procedures employed by the government were intrinsically suggestive, as the sole eyewitness [endlessly] points out to Lt. Balma, throughout the various non-identifications, until through **exclusion**, Medina identifies petitioner as the shooter; (CT 134-137); then corroborating the unduly suggestive identification with inculpatory evidence of phone records from Eternal Bliss while being prevented from utilizing phone records from Gutierrez's other phone (Hubby) and all phone records of Michael Bonner and Suspect #2.  As well as available impeachment evidence e.g., that Medina told police their other phone Hubby "was dead." (CT 266.)  Although, Metro PC records reflect otherwise. (CT 227-232); Medina also told police that several calls were made to Eternal Bliss that day, by a man whose voice she described as African-American, who wanted to buy a gun. (RT 907-914.)  Medina claimed they had never set-up the voicemail feature for Eternal Bliss, so this man could not have left a voice message from Suspect

#2's phone to Eternal Bliss. (RT 1371-74,1392-95.)  Yet, Metro PC

records evince Eternal Bliss did in fact have the voicemail feature.

Medina, also asserted Gutierrez called Marta on the way to the hos-

pital from Eternal Bliss, yet Metro PC records belie such an averment.

(RT 1395-1396,1403,2140).

Tantamount, the copious **impeachment** evidence of the government's

sole percipient witness, [Medina], and the role this evidence would

have at trial, impugning the veracity of her testimony and identifi-

cation of petitioner thereto.

Notwithstanding, the prosecutor knowing an agency within the

auspices of the District Attorney's Office neglected to perform

their duty in marshalling **Brady** material, then to have the audacity

[during closing argument], to tell the jury, viz., the People are

sure if the defense had phone record evidence they surely would

have presented it. (RT 2636).

We can acquiesce, the police would have recognized the importance

of all of the phone records of Gutierrez's phone's were relevant

to their investigations, as were the phone records of Suspect #2,

and Bonner who called the victim just prior to the shooting.  The

**bad faith** is pellucid.

The trial court's evidentiary ruling precluding the discovery

and subsequent introduction of the seemingly plenary evidence of

third party culpability, denied petitioner the opportunity to pre-

sent a complete defense. (RT 56-561.)

Notwithstanding, the State's failure to respond to the entire

third-party culpability argument.  Essentially, negating to deter-

mine whether the cross-admissible evidence of Suspect #2, who had

allegedly confessed to killing Mario Monge while driving in a van
with Gutierrez; and Medina's proffer that at Mario's funeral people
were saying the shooter intended to kill Gutierrez.

Surely, this evidence was substantial, that of solid value, raising
a reasonable probability for a more favorable outcome, correlative
with the record before the trier of fact. Agurs, 427 U.S. at 112.

Because all of the trial court's errors pertained to evidence
relevant to the only issue before the jury, i.e. identity and
corroboration thereto; and all of the improperly admitted evidence
bolstered the State's case, while all of the erroneously excluded
evidence rendered petitioner's defense far less persuasive than it
might have been, it was objectively unreasonable for the California
Court of Appeal to conclude the conflated effect of these errors
did not violate petitioner's due process rights, requiring reversal.
(§2254(d)(1),(2).)

1         List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    _____

5    _____

6    _____

7    Do you have an attorney for this petition?          Yes_____     No_x___

8    If you do, give the name and address of your attorney:

9      Pro Se._____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _February 2, 2010_____     _Lenora Huguton_____

14                Date                         Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

2-10-12

To:      **CLERK OF THE COURT**
         [ ] SUPERIOR COURT                    [X] FEDERAL DISTRICT COURT
         [ ] COURT OF APPEAL                   [ ] FEDERAL COURT OF APPEAL
         [ ] CALIFORNIA SUPREME COURT          [ ] U.S. SUPREME COURT

From:    Demora Henderson                      CDC #: G-21923
         California State Prison - Solano
         Housing: 1/117
         P.O. Box 4000
         Vacaville, California 95696-4000

Re:      [ ] PETITION FOR WRIT OF HABEAS CORPUS
         [ ] PETITION FOR REHEARING/RECONSIDERATION
         [ ] PETITION FOR REVIEW
         [ ] BRIEF ON APPEAL
         [ ] MOTION TO COURT

Case:    [ ] IN RE _____
         [ ] PEOPLE v. _____
         [xx] OTHER:  Henderson v. Swarthout


Dear Clerk:

   I am presently incarcerated at the California State Prison - Solano, in Vacaville. Due to my
incarceration, indigency or minimal funds, and the current policy of the California Department of
Corrections as stated in Deputy Director Memorandum 15/04, I cannot provide the required
number of copies as required by the Rules of Court.

   Therefore, I must respectfully request that the court make the required additional copies and
to serve any required copies on other parties as necessary.

   Furthermore, please send a conformed copy of the documents back to me as a receipt of
filing. I apologize for any inconvenience that this may have caused.

                                                    Respectfully submitted,

                                                    Demora Henderson

# EXHIBIT   A

Court of Appeal, First Appellate District, Division Three - No. A121992

S191260

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

THE PEOPLE, Plaintiff and Respondent,

v.

DEMORA HENDERSON, Defendant and Appellant.

---

The petition for review is denied.

SUPREME COURT
**FILED**

APR 1 3 2011

Frederick K. Ohlrich Clerk

Deputy

CANTIL-SAKAUYE
*Chief Justice*

S185363

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re DEMORA HENDERSON on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

SEP – 1 2010

Frederick K. Ohlrich Clerk

---

Deputy

---

GEORGE

*Chief Justice*

<u>CERTIFICATE OF SERVICE BY MAIL</u>

I, the undersigned, hereby declare and state that, I am over the age of eighteen (18) years old and I (am)          a party to the within cause of action that on this _10^TH_, day of __February__ ,2012 , I placed the below named legal documents in the United States Mail:


PETITION FOR WRIT OF HABEAS CORPUS

AND IN FORMA PAUPERIS FORM.

_____

_____

_____


for which are addressed to the below named parties/persons:

1. UNITED STATES DISTRICT COURT          2.
   NOTHERN DISTRICT OF CALIFORNIA
   SAN FRANCISCO DIVISION
   450 GOLDEN GATE AVE.
   P.O. BOX 36060
   SAN FRANCISCO, CA 94102
   ATTN: INTAKE DOCKET SECTION

3.                                       4.


I, hereby declare under the penalty of perjury of the laws of the State of California, and the United States, that the above certificate of service is true and correct to the best of my knowledge and recollection.

_____
DECLARANT