United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEMORA A. HENDERSON,

        Petitioner,

    v.

G. SWARTHOUT,

        Respondent.

Case No.  12-cv-00810-CW (PR)

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; DENYING
CERTIFICATE OF APPEALABILITY

Petitioner Demora A. Henderson, a California prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his state conviction.  He contends that the trial court violated his due process rights by denying his motions to: (1) exclude a witness's tainted identifications; (2) exclude cell phone evidence; and (3) compel production of exculpatory evidence. Respondent filed an answer and a memorandum of points and authorities in support thereof and Petitioner has filed a traverse.  For the reasons stated below, the Court DENIES the petition.

BACKGROUND

I. Procedural History

On January 19, 2007, the San Francisco District Attorney filed an information charging Petitioner with murder with the allegation that he personally and intentionally discharged a

United States District Court
Northern District of California

firearm that caused great bodily injury or death.  Clerk's
Transcript (CT) 28-29.  On February 21, 2008, a jury found
Petitioner guilty as charged.  CT 2387, 2398; Reporter's
Transcript (RT) 2759.  On June 2, 2008, the trial court sentenced
Petitioner to fifty years to life in prison.  CT 2648-50.

On January 31, 2011, the California Court of Appeal affirmed
the judgment.  Exh. F, People v. Henderson, 2011 WL 287889 (Cal.
Ct. App.) (unpublished).  On April 13, 2011, the California
Supreme Court summarily denied review.  Exh. H.

On February 21, 2012, Petitioner filed this federal petition
for a writ of habeas corpus.

II. Statement of Facts

The following is a summary of the key facts taken from the
written opinion of the California Court of Appeal.

> Rufino Gutierrez was murdered when he was
> shot in the back of his head while sitting in
> the front passenger seat of his car, next to
> his girlfriend, Christina Medina.  She was
> driving.  His assailant was in the back seat,
> and had arranged to meet Gutierrez in order
> to buy a .380 caliber handgun from him.
> Instead of paying Gutierrez for the gun, the
> perpetrator shot him with it.
>
> The purchase of the gun was arranged through
> a series of calls to Gutierrez's cell phone
> earlier the day of the murder.  The calls
> were from phone numbers associated with
> friends and acquaintances of defendant Demora
> Henderson who did not have a cell phone and
> often borrowed one from others.  One of the
> phone numbers that appeared repeatedly in the
> call records for Gutierrez's phone belonged
> to the aunt of Henderson's friend Dimitri
> Braud.  Braud told police that he and
> Henderson were together at his aunt's house
> during the afternoon and evening before
> Gutierrez was killed.  Braud testified in
> this case as part of an agreement he reached
> with prosecutors. . . .

. . .

Henderson was identified as Gutierrez's killer by Medina in a videotape of a live lineup and in court.

Henderson, 2011 WL 287889, *1 (footnote omitted).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the

Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

A federal court on habeas review may not issue a writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. "A state court must be granted a deference and latitude that are not in operation when the case involves review" under the constitutional standard itself. Harrington v. Richter, 131 S. Ct. 770, 785 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786. The factual determinations by state courts are presumed correct unless there is "clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims in a reasoned opinion.

DISCUSSION

I. Suggestive Photo Lineup

Petitioner argues that the trial court violated his right to due process by denying his motion to exclude Christina Medina's identification of him at the videotaped lineup and later in court

4

1  on the ground that her previous viewing of a photo lineup tainted

2  her two later identifications.

3      A. Background

4      The state appellate court summarized the facts relevant to

5  this claim as follows:

6          The night of the murder Medina described
           Gutierrez's assailant to police as about 25
7          years old with a very dark complexion,
           wearing dark clothes with a "hoodie" that was
8          raised to cover his head.  She also said the
           shooter was skinny, with a long face, acne
9          scars on his cheeks and pimples on his
           forehead.  She thought she would recognize
10         him if she saw him again.

11         A few days later, Medina was shown a photo
           lineup that contained Henderson's photo, and
12         the procedure was recorded on audiotape.
           Before Medina viewed the photos, the officer
13         admonished her that the person who committed
           the crime might not be in the group of
14         photos.  She was told that she was "in no way
           obligated to identify anybody," and people's
15         appearances could change over time and "based
           on the photographic process, they can be
16         lighter or darker."  Medina was unable to
           identify the killer when she viewed the photo
17         lineup, even though she thought Henderson's
           skin color and the shape of his face were
18         similar to the shooter's.  When Medina
           remarked that the shooter was "maybe a little
19         darker" than Henderson's photo, and all the
           photos appeared "lighter" than the shooter,
20         the officer reminded her that the lighting
           when a photo is taken can influence the
21         appearance of a person's skin color.

22         Several weeks later, Medina met with a police
           artist and helped develop a sketch of the
23         shooter based on her memory of his
           appearance.  Approximately a week after that,
24         she was shown a videotape of a live lineup.
           She gasped audibly when she saw Henderson and
25         she identified him as the killer.  A
           videotape was made of Medina's viewing of the
26         videotaped lineup and was shown to the jury.
           Medina explained that the videotaped lineup
27         was "more real" than the photo lineup because
           she could see the people walk and talk.  FN2
28         Medina also later identified Henderson as the

shooter at the preliminary hearing and at trial.

> FN2 The participants in the videotaped lineup wore dark hooded sweatshirts similar to the shooter, walked across the stage, and spoke certain phrases the shooter used on the night Gutierrez was killed.  Medina said Henderson's voice during the videotaped lineup was "a little off," "like . . . he was holding back," but she positively identified him as the shooter, commenting that "it wasn't the other ones."

Henderson, 2011 WL 287889, at *3.

The state trial and appellate courts reviewed the first photo lineup, from which Medina did not identify Petitioner's photo, and found the array of photos was reasonably balanced and no single photo unfairly stood out.  Id.  The appellate court also reviewed the videotaped lineup, found nothing suggestive about it and concluded that Medina's identifications were not the result of impermissibly suggestive procedures.  Id. at *4-5.

B. Federal Authority

Due process may require suppression of eyewitness identification evidence where the identification procedure used was suggestive and unnecessary.  Perry v. New Hampshire, 132 S. Ct. 716, 718 (2012); Manson v. Brathwaite, 432 U.S. 98, 107-09 (1977); Neil v. Biggers, 409 U.S. 188, 196-98 (1972).  However, improper state conduct in arranging unnecessarily suggestive pretrial identification procedures alone does not require exclusion of in-court identification testimony; the reliability of eyewitness testimony is the "linchpin" in determining its admissibility.  Manson, 432 U.S. at 107-14; United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008).  Identification testimony is inadmissible as a violation of due process only if

(1) a pretrial encounter is so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).

In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness's opportunity to view the defendant at the time of the incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  Manson, 432 U.S. at 114-16; see also, United States v. Cook, 608 F.2d 1175, 1178 (9th Cir. 1979) (finding nothing unusual about a lineup being conducted after a photo spread) (overruled on other grounds by Luce v. United States, 469 U.S. 38, 40, n.3 (1984)).

In Cook, a witness could not identify the defendant in a photo lineup, but later identified him in a physical lineup.  The petitioner claimed his picture in the photo lineup was impermissibly suggestive and tainted the identifications in the physical lineup and in court.  Id.  In rejecting the defendant's claim, the court explained that "the suggestion, if any, was not so great as to create a substantial likelihood of misidentification," because the witness had a second look at the perpetrator, gave police a description of the perpetrator shortly after the offense that "reasonably fit" the defendant,

immediately recognized the defendant upon seeing him in person at the physical lineup, and stated that, although he recognized the defendant from the photo lineup, his identification was based on his observations at the time of the crime.  Id. at 1179.

C. Analysis

Both the trial and appellate courts viewed the photographic lineup that was shown to Medina and found nothing suggestive about the photographs included.  The trial court also found that Petitioner looked very different in the photographic lineup and the video lineup.  The state court's factual findings must be presumed correct.  28 U.S.C. § 2254(e)(1); RT 531-45; Henderson, 2011 WL 287889, at *3-4 & n.5.[1]

Although Medina did not identify Petitioner in the photographic lineup, she indicated his photograph most closely resembled the shooter.  RT 957-59; 1064.  Several weeks later, when viewing a videotape of a live lineup, Medina immediately recognized Petitioner and gave an audible gasp.  RT 978-81.  She stated the live lineup was "more real" than the photographic lineup.  RT 1066.  These facts are similar to those in Cook, where the court found nothing unusual in the witness first being shown a photographic lineup and later being shown a physical lineup where he identified the defendant

Most importantly, the evidence shows that Medina's identification of Petitioner was reliable.  Medina testified that she was "paying attention" to the man who approached the car on

---

[1] Because the copy of the photographic lineup included in the administrative record is not legible, the Court requested and received a legible copy.  The state courts' finding—that the lineup was not suggestive—was not unreasonable.

United States District Court
Northern District of California

the night of Gutierrez's murder because she was concerned about Gutierrez's gun sale to a stranger.  RT 1062.  There was good lighting and Medina was able to see the man's face and body type.  RT 932-34.  Soon after Gutierrez was shot, Medina gave the police a description of the shooter which matched Petitioner and which did not vary from her first report at the hospital to her testimony at trial.  Shortly after the shooting, she helped compose a sketch of the shooter that closely resembled Petitioner.  Medina also was certain of her identification of Petitioner at the videotaped lineup, at the preliminary hearing and at trial.  RT 1069-71.  Although she did not identify Petitioner in the photographic lineup, the trial court found that Petitioner looked different in the photographic lineup than he looked in the videotaped lineup.  Finally, Medina positively identified Petitioner less than two months after the shooting, when her memory of the shooter was still strong.

Under the totality of the circumstances, Petitioner has not shown that the photographic lineup was suggestive or that Medina's later identification of him was unreliable.

II. Cell Phone Records

Petitioner argues that the trial court violated his due process rights by denying his motion to exclude the prosecution's evidence of records of telephone numbers of incoming and outgoing calls on Gutierrez's cell phone, as a sanction for the failure of the police to obtain and preserve additional cell phone records that were allegedly exculpatory.

A. State Court Opinion

The state appellate court rejected this claim, as follows:

1

## 1. Bonner's Cell Phone Records

Gutierrez received several calls on the day
he was killed from a phone number registered
to "Easy Smith," and that phone number was
the last one dialed from Gutierrez's cell
phone about an hour before he was shot.
Approximately a year after the shooting, the
investigating officer, Lieutenant Balma,
learned that the "Easy Smith" phone number
was associated with Henderson's friend
Michael Bonner.  The records for the "Easy
Smith" phone had already been purged by the
phone company.  FN6

    FN6  The cell phone company purged its
    call records after six months.

Henderson contends that it could have been
Bonner and not he who arranged to meet
Gutierrez, and he was prejudiced by the
inability to obtain the "Easy Smith" phone
records.  But the investigating officer
testified that Bonner did not match
Henderson's description.  He had a
"completely different body build," and was
"much bigger, much heavier than [Henderson],
who is very thin."  Thus, there is no basis
to conclude Bonner would have been identified
as the shooter by Medina. . . . Moreover, as
the trial court noted, the call records for
Bonner's phone would not have shown who
placed the calls, and there is no reason to
conclude the records would have been
exculpatory.  Substantial evidence supports
the trial court's findings.  Henderson failed
to show the missing call records for Bonner's
phone would have been exculpatory, or that
police acted in bad faith by failing to
obtain and preserve them. . . .

## 2. Suspect Number 2's Phone Records

A few days after Gutierrez was killed, Balma
received information regarding a potential
suspect named "Shaun" or "Shawn," who had
reportedly claimed he "killed some Mexican in
the Mission."  Balma prepared a search
warrant for a cell phone number said to
belong to "Shaun," but the phone company
inadvertently transposed the last two digits
when it retrieved the records.  By the time
Balma realized he had the wrong records, the
phone company had purged the correct ones.

United States District Court
Northern District of California

United States District Court
Northern District of California

The subscriber name for the phone number that reportedly belonged to "Shaun" was Lauren Arendt, who was not able to assist police in identifying "Shaun," and Balma was never able to otherwise identify who "Shaun" was. In any event, the phone number alleged to be Shaun's did not appear on the list of calls received on Gutierrez's phone, and Balma did not consider the location where Gutierrez was killed to be in the Mission. Under the circumstances, Henderson has not shown Shaun's cell phone records would have been exculpatory, or that police acted in bad faith by failing to notice earlier that the cell phone company provided the wrong records.

3. Call Records for Medina's and Gutierrez's Second Cell Phone

Based on information provided by Medina, Balma obtained call records for a cell phone with the subscriber name "Eternal Bliss" that Gutierrez used to arrange the sale of his handgun on the day he was shot. Since Medina identified the "Eternal Bliss" phone as the one Gutierrez used in the sale of the gun, Balma did not seek call records for a second phone used by Medina and Gutierrez which they had with them at the time of the murder.

Henderson argues the records from the second cell phone could have been used to impeach Medina's statement to police that it was not functional. But Medina testified that both phones were working the day Gutierrez was killed. So, there is no apparent significance of the records for impeachment. The call records of Eternal Bliss showed that it received multiple calls from the second phone on the day of the murder, and Balma testified he believed both phones were operational on the night Gutierrez was killed. Henderson's claim is that police should have obtained the call records for the second phone because the shooter could have used that number to contact Gutierrez. His speculation is insufficient to establish that the records would have been exculpatory, or that Balma acted in bad faith when he determined it was not necessary to obtain them.

11

United States District Court
Northern District of California

    4. Voicemail Message Allegedly Left on
    Gutierrez's Eternal Bliss Cell Phone

    The call records for the Eternal Bliss phone
    showed that a seven second call was received
    on the phone's voicemail from Bonner's phone
    several hours before Gutierrez was killed.
    Henderson claims police should have preserved
    any voicemail message.  But Medina told
    police the phone's voicemail feature was
    never activated, and the call records
    indicate that no one attempted to retrieve
    any voicemail messages from the Eternal Bliss
    phone.  Inspector Balma also concluded that
    seven seconds would not have been enough time
    for a caller to listen to the phone company's
    recorded greeting and leave a message.
    Moreover, the police inspector who examined
    the phone found no voicemail messages.
    Substantial evidence supports the trial
    court's finding that it was speculative to
    conclude that any voicemail message was left
    on Gutierrez's phone, much less that it was
    exculpatory, or that police efforts to
    retrieve such a message were in bad faith.

    Even if we assume for the sake of argument
    that police failed to properly preserve the
    cell phone records in question, Henderson's
    argument that they would reveal exculpatory
    evidence is speculative at best, as are his
    allegations that police acted in bad faith in
    failing to successfully pursue and preserve
    them.  His assertions are not sufficient to
    establish a due process violation. . . .

Henderson, 2011 WL 287889, at *6-8 (two footnotes omitted).

  A. Federal Authority

  The government has a duty to preserve material evidence,

i.e., evidence whose exculpatory value was apparent before it was

destroyed and that is of such a nature that the defendant cannot

obtain comparable evidence by other reasonably available means.

California v. Trombetta, 467 U.S. 479, 489 (1984); Grisby v.

Blodgett, 130 F.3d 365, 371 (9th Cir. 1997).  However, the

government's duty to preserve material evidence is limited to

evidence it has gathered.  Trombetta, 467 U.S. at 488-90.  Unless

the petitioner shows bad faith by the police in the failure to preserve potentially useful evidence, there is no due process violation.  Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Cunningham v. Perez, 345 F.3d 802, 812 (9th Cir. 2003) (failure to gather physical evidence did not show bad faith; its value was speculative because it could have exonerated or incriminated the moving party).

C. Analysis

The trial court held an evidentiary hearing on Petitioner's motion in limine to exclude the phone records from Gutierrez's phone.  Inspector Balma was questioned extensively regarding his investigation of Gutierrez's murder to determine if his failure to collect other cell phone records was done in bad faith.  RT 109-371.

1. Records from Bonner's Phone

Petitioner argues that Balma showed bad faith by overlooking the evidentiary value of the last phone number called by Gutierrez before his murder, which was to Bonner's phone, because when Balma attempted to obtain the records, they had been purged.

Balma gave the following testimony pertaining to this claim: (1) the phone records for Gutierrez's phone only provided the numbers of the phones from which calls were made or received, Balma had to separately request names and addresses pertaining to the subscriber of each number; (2) many of the subscribers gave the phone company fictitious names and addresses; (3) the telephone number of the last call Gutierrez made before his murder was registered to a person named "Easy Smith;" (4) Balma

13

went to the address given for the "Easy Smith" number, mistakenly determined that it did not exist and concluded that the address was fictitious; (5) months later, when talking with an assistant district attorney familiar with the case, Balma realized that the "Easy Smith" number belonged to Bonner; (6) Balma then requested the phone records from Bonner's phone but, by that time, the phone company had purged the records in accordance with its policy of purging records every six months; and (7) the records from Bonner's phone would only have provided numbers called from or to the phone; they would not have indicated the name of the caller or the receiver.   RT 183; 201-09; 292-94.

The test to determine Balma's bad faith is whether he was aware of any potential exculpatory value of the records for the "Easy Smith" number at the time he decided not to issue a warrant for them.   The evidence shows that, as a result of Balma's warrant for the records from Gutierrez's phone, he received a long list of telephone numbers, many of which were registered to fictitious names at fictitious addresses.   Balma obtained the subscriber information for what turned out to be Bonner's phone, but it was registered to "Easy Smith."   Therefore, the actual subscriber of that number was not apparent to him.   Balma also went to the address given for the phone number, but he inadvertently looked for a house number that did not exist.   This oversight may have been negligent, but it does demonstrate bad faith.   Balma concluded the subscriber name and address were fictitious and, thus, of no value to his investigation.   Because it was not apparent to Balma that the phone records had any evidentiary value, let alone exculpatory value, his decision not

United States District Court
Northern District of California

United States District Court
Northern District of California

to pursue them further does not constitute bad faith. Furthermore, as soon as Balma realized that Bonner was the subscriber, he obtained a warrant for the phone records.  At the time, Balma was not aware of the phone company's policy to purge records every six months.  Although the destruction of the records made them unobtainable by Petitioner, the fact that they were destroyed by a third party does not show bad faith by Balma. Furthermore, as noted by the appellate court, trial testimony that Bonner's description did not fit Medina's description of the shooter eliminated Bonner as a possible suspect.  RT 1973.  Given this evidence, Petitioner's argument that Bonner's phone records would have shown that Bonner or someone else was the murderer is purely speculative and does not meet the standard of constitutional materiality explicated in Trombetta.

2. Phone Records for "Suspect Number Two"

At the evidentiary hearing, Balma testified to the following regarding "Suspect Number Two."  He received a "tip" from someone that a person named "Shaun" or "Shawn" had claimed to have "killed a Mexican in the Mission."  Balma obtained the phone records for the number allegedly belonging to the suspect, but the phone company transposed two digits and sent him the wrong records.  By the time Balma realized the records were incorrect, the phone company had purged the correct ones.  Balma questioned the subscriber associated with the telephone number given for suspect number two, a woman named Lauren Arendt, who did not know anyone by the name of "Shaun" or "Shawn."  RT 226-27.  Although Balma investigated many other leads, he was not able to identify a person named "Shaun" or "Shawn" and concluded that the suspect

United States District Court
Northern District of California

did not exist.  RT 227-28.  The telephone number given for suspect number two did not appear in the phone records for Gutierrez's phone.  RT 228.

Given this evidence, Petitioner's argument that the phone records for suspect number two were exculpatory is based on pure speculation.  First, no evidence shows that suspect number two exists.  Second, the fact that the phone number given for suspect number two was not listed in Gutierrez's phone records shows that he did not call Gutierrez's phone to arrange the gun transaction, indicating he most likely was not the shooter.  Furthermore, Balma thoroughly investigated the leads about suspect number two, including obtaining a warrant for the records of his alleged phone number.  That the phone company transposed two digits of the phone number and purged its records after six months does not show bad faith by Balma.

3. Records for Gutierrez's Second Cell Phone

Petitioner's argument that phone records for Gutierrez's second cell phone would have revealed the real murderer is also speculative.  Balma did not collect those records because, according to Medina, all the conversations for the gun sale were conducted on the phone for which the records were obtained.  RT 189-90; 209; 219; 245.  Balma had no reason to doubt Medina's credibility and, thus, he did not believe that records from the second phone would provide information that would be relevant to the murder investigation or exculpatory to Petitioner.  RT 234; 294.  Because the records could have contained inculpatory as well as exculpatory information, their value to Petitioner's defense is purely speculative.  Petitioner has not shown Balma

acted in bad faith.

### 4. Voicemail Message

Petitioner's argument that exculpatory evidence would have been found in a voicemail message left on Gutierrez's phone on the night of the murder is refuted by the fact that no evidence of a voicemail message exists. RT 338.  Medina told Balma that the voicemail feature on the phone had not been activated.  RT 232-33.  Her information was corroborated by evidence that no one had attempted to retrieve a message, that the seven-second call would not have been long enough for a caller to both listen to a recorded message and to leave a message and that the police inspector who examined the phone for messages failed to find any. RT 229-34; 315-16; 321-24.  Again, Petitioner has not shown bad faith by Balma.  To the contrary, Balma persisted in tracking down a voicemail message, but could not find one.

Petitioner's arguments based on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and <u>United States v. Bagley</u>, 473 U.S. 674, 676 (1985), are misplaced. <u>Brady</u> and its progeny addressed the suppression of exculpatory evidence in the possession of or known to the prosecution or the police, in which case the good or bad faith of the police is not relevant.  <u>Brady</u>, 373 U.S. at 87.  Petitioner claims that the police failed to collect or preserve potentially exculpatory evidence.  For these allegations to establish a due process violation, he must show that Balma acted in bad faith, which he has failed to do.

### III. Exclusion of Evidence of Another Homicide Investigation

Petitioner contends he was denied the right to present a

17

third party culpability defense because the trial court denied his motion to compel discovery of police records of the investigation of the murder of an individual named Mario Monge.

A. Federal Authority

"The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006); Trombetta, 467 U.S. at 485.  The constitutional right to present a complete defense includes the right to present evidence.  Washington v. Texas, 388 U.S. 14, 19 (1967).  However, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 326.  The right to present a defense is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." Washington v. Texas, 388 U.S. at 16.  The Supreme Court rarely has held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.  Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013). Evidence of third party culpability "may be excluded where it does not sufficiently connect the other person to the crime, as for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendants' trial." Holmes, 547 U.S. at 327 (citations omitted).

B. Analysis

Before trial, the defense sought discovery of police reports of the shooting of Mario Monge, which occurred in November 2005,

a few months before Gutierrez's murder in February 2006.  CT 137-38.  The prosecution opposed the motion under California Evidence Code section 1040, arguing that disclosure would jeopardize an ongoing police investigation.[2]  CT 162-68.  The trial court conducted an in camera review of the report which was followed by an open adversarial hearing.  RT 555-56; 557-65.  The trial court found that Petitioner's argument that the person who killed Monge might also have killed Gutierrez was purely speculative, especially in light of the fact that the Monge killing was unsolved after two years of police investigation.  RT 561.  The trial court noted that, in order for Petitioner to establish a third party culpability defense, the defense would first have to solve the Monge homicide because, without evidence of Monge's killer, the argument that the unknown person who killed Monge also killed Gutierrez was the essence of speculation and could not be presented to a jury.  RT 561-62.  The trial court concluded that the speculative benefit of the police report to Petitioner could not overcome the government's substantial interests in the need for confidentiality in an ongoing criminal investigation and the privacy rights of Monge's family and the witnesses to the crime.  RT 562-64.

---

[2] California Evidence Code section 1040(b) provides:

A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and . . . disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice.

The state appellate court performed an in camera review of the sealed records of the trial court's in camera review, found "no factual connection between the killings of Monge and Gutierrez" and affirmed the trial court's decision to deny Petitioner's motion to disclose the police report of Monge's killing. Henderson, 2011 WL 287889, at *8.

Petitioner argues that the state appellate court's ruling was unreasonable because it addressed only his discovery request for the police reports pertaining to the Monge murder; he argues he asserted the broader claim of the denial of evidence regarding a third-party culpability defense which included evidence that "suspect #2" had "confessed to the killing of Gutierrez or a Mexican in the Mission (noting, Gutierrez was killed in the Mission and is Hispanic)." Traverse at 32.  This argument is unavailing.  As discussed above, Balma attempted to ascertain the identity of "suspect #2," who was identified as "Shaun" or "Shawn," and his investigation did not disclose any such individual.  RT 172-81; 226-29.  Balma also testified that Gutierrez's murder did not occur in the Mission district but in the Excelsior-Balboa Park area, so the alleged confession most likely did not apply to Gutierrez's murder.  RT 229.

Petitioner also relies on a statement Medina made to Balma that someone named Mario had recently been killed and she had heard rumors that the killer meant to shoot Gutierrez because he was thought to be in the car with Mario.  CT 144-46.  However, Medina also stated that the rumors did not "sound right" to her

1   because she knew that "Fino[3] doesn't even kick it with him,"

2   meaning that Gutierrez did not associate with Mario.  CT 149.

3   Thus, Medina's statements cast doubt on any rumors that the

4   unidentified person who shot Monge also shot Gutierrez.

5       Furthermore, as the trial court found, the only similarities

6   between the two murders were that both victims were Hispanic,

7   both died from gunshot wounds and both were alleged to have been

8   associated with gang activity.  The dissimilarities included the

9   location and circumstances of the two shootings, in that

10  Gutierrez was shot by a person who entered the backseat of his

11  car after arranging a sham gun transaction and Monge was killed

12  by a person shooting into his car as he drove by.  The cases were

13  also distinguished by the fact that there was no arrest for

14  Monge's murder whereas there was an arrest for the murder of

15  Gutierrez.  RT 558.  These dissimilarities show the low probative

16  value any evidence of the Monge case would provide to

17  Petitioner's defense.

18      Petitioner fails to show that the state court's denial of

19  this claim "was so lacking in justification that there was an

20  error well understood and comprehended in existing law beyond any

21  possibility for fairminded disagreement."  See Harrington, 131 S.

22  Ct. at 786-87.

23  IV. Cumulative Error

24      Petitioner contends that, even if no single error warrants

25  habeas relief, the cumulative effect of all the errors does

26  warrant relief.  In some cases, although no single trial error is

27

28  ─────────────────
    [3] Medina called Gutierrez, "Fino."

United States District Court
Northern District of California

sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  <u>Alcala v. Woodford</u>, 334 F.3d 862, 893-95 (9th Cir. 2003).  Where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation.  <u>Hayes v. Ayers</u>, 632 F.3d 500, 524 (9th Cir. 2011); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002).  Because Petitioner fails to show any constitutional error, there is no error to cumulate.

V. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

United States District Court
Northern District of California

1    The Court finds that reasonable jurists would not find its

2 ruling on any of Petitioner's claims debatable or wrong.

3 Therefore, a certificate of appealability is denied.

4    Petitioner may not appeal the denial of a certificate of

5 appealability in this Court but may seek a certificate from the

6 Court of Appeals under Rule 22 of the Federal Rules of Appellate

7 Procedure.  See Rule 11(a) of the Rules Governing Section 2254

8 Cases.

9 CONCLUSION

10    Based upon the foregoing, the Court orders as follows:

11    1. The petition for a writ of habeas corpus is denied.

12    2. The Clerk of the Court shall enter a separate judgment,

13 terminate all pending motions and close the file.

14    3. A certificate of appealability is denied.

15    IT IS SO ORDERED.

16 Dated: March 23, 2015

17 _____

18 CLAUDIA WILKEN
United States District Judge